514

**HELIS v. WARD et al.**
**No. 292.**

District Court, E. D. Louisiana.
Sept. 3, 1937.

W. N. Bonner, of Houston, Tex., W. D. Gordon, of Beaumont, Tex., and Andrew R. Martinez, of New Orleans, La., for Bryan Ward et al.

Lloyd J. Cobb, of New Orleans, La., for William Helis.

BORAH, District Judge.

■ This controversy involves primarily, the interpretation of a contract to determine the applicable purchase price due thereunder. The contract in question was in reality an option to purchase an oil, gas, and mineral lease covering land located in Louisiana, and it was provided that the option should be consummated in Louisiana. Under these circumstances the law of Louisiana governs, notwithstanding the fact that this contract was made and executed in the State of Texas.

The record supports the following conclusions as to the material facts: On February 6, 1935, William Helis entered into a written agreement with Iberia Oil Corporation and Y. D. Spell for the purchase of their interest in a mineral lease dated September 28, 1931, covering a certain tract of land situated in the Little Bayou Oil Field in Iberia Parish, La. When this lease was executed, Iberia Oil Corporation and Y. D. Spell had a producing oil well on their property known as Bernard No. 1 and were in process of drilling another well known as Bernard No. 2, and under the terms of the contract of February 6, 1935, Helis agreed to drill a third well at his own expense to be known as the Bernard No. 3 well. It was stipulated that in the event either the Bernard No. 2 well or the Bernard No. 3 well should be brought in as a producer, Helis was given the right under said contract to acquire the mineral lease in accordance with the terms and provisions set forth in paragraphs 3 and 4 of said agreement, which are as follows:

"3. At any time prior to the expiration of the options herein granted, Second Party shall have the right to purchase the afore-described mineral lease and all rights thereunder, including all oil produced from

the Bernard #1 well from the date of completion of the Bernard #2 well, as follows:

"(a) In the event the Bernard #2 well or the Bernard #3 well should be brought in as producers the purchase price of the leasehold interest shall be $300,000.00 if the average daily production of said wells for a period of fifteen days after completion is less than 3000 barrels each, calculated on a 3/8-inch choke according to the methods usually employed in gauging the capacity of oil wells.

"(b) In the event either the Bernard #2 or the Bernard #3 well should be brought in capable of production more than 3000 barrels per day, calculated as above set forth, then the purchase price shall be $400,000.00

"The purchase prices above set forth shall be paid, fifty per cent. in cash as provided herein, and fifty per cent. out of 1/4th of 7/8ths of the proceeds derived from the production from all wells drilled and hereafter drilled on the said property.

"First Parties agree that any existing oil payments shall be paid and fully discharged out of the cash portion of the purchase price contemporaneously with the payment thereof by Second Party; it being the intention of the parties that Second Party shall acquire the full 7/8ths working interest of First Parties free and clear of any and all liens and encumbrances whatsoever.

"4. In addition to the applicable purchase price to be paid by Second Party, as above set forth, Second Party shall also pay to First Party, in the event any option granted herein is exercised, the actual cost incurred by First Parties in the drilling of the Bernard #2 well, whether the said well is a producer or not, and Second Party shall pay, whether the aforesaid option to purchase be exercised or not, the entire cost of drilling and completing the Bernard #3 well, which shall be solely for account of Second Party and free of any obligation whatever to First Parties. In drilling said well #3 as above provided, Second Party will pay all bills as they accrue and protect First Parties and the leasehold estate against the filing of any liens."

Pursuant to and in accordance with the provisions of said contract, Helis moved his equipment onto the premises and drilled the Bernard No. 3 well to a depth of approximately 4,092 feet, but it was not a producer. The Iberia Oil Company and Y. D. Spell in the meantime continued drilling their Bernard No. 2 well, as they were obliged to do, and on or before April 1, 1935, finally abandoned same as a dry hole.

On April 1, 1935, the contracting parties entered into a supplemental agreement by the terms of which Helis obligated himself to continue drilling to at least 4,800 feet. Helis continued drilling, and on April 21, 1935, his Bernard No. 3 well was brought in as a producer. Immediately after the well was placed on production, and prior to any test as to capacity, Iberia Oil Company and Y. D. Spell asserted a claim for the maximum purchase price of $400,000. Helis insisted that the capacity of the well, determined in accordance with the provisions of the contract, that is on a three-eighths inch choke, was less than 3,000 barrels of oil per day and that the applicable purchase price was $300,000.

On April 26, 1935, Iberia Oil Company and Y. D. Spell designated E. O. Buck, a petroleum engineer, as their representative to make a test to determine the capacity of the well. Helis had previously indicated his willingness to make the test in accordance with the terms of the contract, but the evidence does not establish that he participated in the test subsequently conducted by Buck. On April 29, 1935, Buck rendered a report based on his observation of the well on two different days and on various chokes ranging in size up to one-half inch, and stated that his observations on these several chokes were such that he was of opinion the Bernard No. 3 well would produce in excess of 3,000 barrels per day on any choke as large as a five-eighths inch choke. Buck's report, a copy of which was sent to Helis, definitely stated that the well was incapable of producing 3,000 barrels of oil per day on a three-eighths inch choke, which is the size choke stipulated in the contract.

On May 2, 1935, Iberia Oil Corporation was dissolved and its assets transferred to Bryan Ward, A. L. Mitchell, and L. B. Mhoon.

A rider to the contract of February 6, 1935, provided for the appointment of an umpire in the event the parties failed to agree on the proper gauge on the well or wells and acting thereunder, and over the protests of Helis, W. A. Massey, a petroleum engineer, was designated. Massey, in company with Buck, conducted a test and on May 6, 1935, reported in writing that observations on chokes varying in size

from one-fourth to five-eighths of an inch caused him to concur in Buck's report. He also stated definitely that the well could not produce 3,000 barrels of oil per day on a three-eighths inch choke.

Under the contract Helis was required 'to accept or reject the option to purchase the mineral lease within two days after the expiration of a test period of fifteen days following the completion of the well, and his failure to do so would have resulted in the forfeiture of all his rights under the contract, and the Bernard No. 3 well would have become the sole property of Messrs. Ward, Mhoon, Mitchell, and Spell. Conformably to the contract provisions, Helis exercised his option to purchase by registered letter, wherein he reiterated his insistence that the applicable purchase price was $300,000. However, in order to protect his rights and minimize his losses, Helis advised the sellers that his exercise of the option was to be construed to apply to whichever purchase price was applicable, and that if they insisted on the payment of the maximum price of $400,000, he would comply with their demand with full reservation of his rights under the agreement.

In due course and in keeping with the terms of the contract, Messrs. Ward, Mitchell, Mhoon, and Spell forwarded to the National Bank of Commerce in New Orleans an assignment of the mineral lease, together with two drafts, one for $215,-530.34 and another for $1,918.90. The purchase price of the lease was payable 50 per cent. in cash and the balance out of oil to be produced, and the draft for $215,530.34 represented 50 per cent. of the maximum purchase price of $400,000, plus $15,530.34 which the sellers claimed represented the actual costs incurred in drilling the Bernard No. 2 well. The draft for $1,918.90 represented fuel oil consumed in the drilling of the Bernard No. 3 well and which Helis had agreed to pay. These drafts were paid on May 13, 1935, and Helis received the assignment of the lease and recorded same in the conveyance records of Iberia parish, La.

On paying the drafts Helis immediately instituted an attachment suit in the civil district court for the parish of Orleans to recover the sum of $50,000, being the difference between what he considered the correct cash portion of the purchase price, namely, $150,000, and the amount of $200,-000, which was actually paid. Funds in the National Bank of Commerce in New Orleans belonging to the sellers were seized, but immediately thereafter the excess of the seized funds over $50,000 was released. The attachment suit was thereafter removed to this court, and during the course of these proceedings the suit was voluntarily dismissed by Helis without prejudice to the rights of defendants, when it appeared that the amount overpaid, plus sums due the sellers out of oil production aggregated the purchase price of $300,000. Because of complainant's action in dismissing his petition and complaint against the defendants and cross-complainants, Messrs. Ward, Mitchell, Mhoon, and Spell were permitted to file in lieu of their cross-bill and complaint an amended and substituted bill denominating themselves as complainants and the said William Helis as defendant. They pray for a decree canceling said transaction and restoring to complainants the title and possession of said property on the theory that defendant's conduct estops him from claiming the complainants' property; or if not entitled to this relief, complainants further pray that the purchase price of said property be fixed at $400,000.

After Helis acquired the leasehold estate, the oil production was sold and the balance of the proceeds of the sale were paid to him, and in conformance to the contract he paid to the sellers in proportion to their interests the balance due on the basis of a purchase price of $300,000, and these payments were received without objection. Helis deducted from the purchase price the sum of $3,111.09 to reimburse him for a similar amount which he had paid to cover the cost of drilling the Bernard No. 2 well, on the ground that the items aggregating this amount were improper charges. These payments were made by Helis without prejudice to the suit which was then pending for the recovery of the alleged overpayment, and without admission of liability either for the purchase price of $400,000 then claimed or for the sum claimed to have been expended in the drilling of the Bernard No. 2 well.

By the acceptance of the checks sent by Helis in payment of the balance of the purchase price and in various communications, cross-complainants herein recognized Helis as the owner of the leasehold estate and did not attack his title thereto until January 29, 1937, almost two years after the Bernard No. 3 well was brought in, when substituted and amended pleadings were filed herein claiming Helis was es-

topped to claim title as the result of the action taken by him in instituting the aforementioned attachment proceedings. Since the filing of this suit, one of the complainants, Y. D. Spell, has accepted his proportion of the $50,000 fund under seizure, and in doing so specifically released Helis from any and all liability with respect to the payment of the maximum purchase price due under said contract.

The contract of February 6, 1935, was between parties engaged in the same line of business, was prepared jointly by the contracting parties and their respective counsel, and was executed in the office of counsel for the sellers. Under the circumstances it would seem reasonable to assume that the parties contracted with knowledge of those general conditions which are known throughout the oil industry.

The capacity of an oil well in the Louisiana gulf coastal region is the actual production thereof measured either on a particular choke or on an open flow. Complainants' own expert concedes that it "is impracticable, if not impossible, to produce a well located on a salt dome structure such as this was on an open flow, because to do so would kill the well within a very short period. The phrase "according to the usual methods employed in gauging the capacity of oil wells" simply means that the well is flowed through a particular choke for a period of one or two hours and the amount of oil actually produced into the gauge tank is multiplied by the figure necessary to determine the twenty-four hour production. This is the capacity of the well on the particular choke used. The testimony in this case is all one way and to the effect that it is impossible to determine the capacity of an oil well in the Louisiana gulf coastal region on any other choke simply by observing the well on a three-eighths inch choke. Indeed, it is difficult to perceive how complainants can derive any comfort from the testimony of their witness Buck, for he admitted that his estimate that the Bernard No. 3 well would produce more than 3,000 barrels of oil per day on a choke larger than a five-eighths inch choke was not the usual and customary method of determining the capacities of oil wells in the oil industry. Furthermore, he testified that the Bernard No. 3 well could not produce more than 3,000 barrels of oil per day through a three-eighths inch choke according to the usual methods employed in gauging the capacity of oil wells,

and that it was impossible to determine the open flow capacity of a well by observing it on a three-eighths inch choke solely. He did testify that in his opinion it was not possible for the Bernard No. 3 well to produce as much as 3,000 barrels of oil per day on a three-eighths inch choke, but according to my recollection no testimony was offered with respect to the production of a lighter gravity oil from a deeper producing horizon. But be this as it may, I am of the firm belief that this opinion testimony has no legal significance. The contract is plain and unambiguous, and if the parties unwittingly contracted for a premium or bonus on the happening of an impossible condition, the provision of the contract with respect thereto is of no legal consequence.

The record justifies but one conclusion, and that is that the Bernard No. 3 well was incapable of producing as much as 3,000 barrels of oil per day calculated on a three-eighths inch choke according to the methods usually employed in gauging the capacity of oil wells. It follows that the proper purchase price was $300,000, and that the action taken by Helis in the preservation of his rights under the agreement were entirely proper. The disputed items of drilling costs have not been made an issue in this suit, and I express no opinion with reference thereto.

Nor is there any merit in complainants' plea of equitable estoppel. To establish equitable estoppel or estoppel in pais, there must be a false representation or wrongful or misleading silence on the part of the party sought to be estopped. The error claimed must originate in a statement of fact, and not an opinion or statement of law, and the person claiming the benefits of estoppel must be ignorant of the true facts and adversely affected by the acts or statements of the person against whom an estoppel is claimed. There is no evidence in this record indicating that Helis misled the plaintiffs by false representations. To the contrary, he openly and consistently maintained that the proper price was $300,000, and he paid the larger amount initially demanded with full reservation of all of his rights under the contract and in order to avoid irreparable injury. The execution and delivery of the assignment was not induced by any misrepresentation on the part of defendant, but was made by the plaintiffs pursuant to the obligations imposed upon them by the contract. Subsequent to

the execution of the assignment the plaintiffs recognized Helis as the owner of the leasehold estate, and with full knowledge of his development of the property failed to assert any claim of ownership thereto until almost two years had elapsed from the date of his purchase of the lease. The claim that defendant is equitably estopped to assert title to the leasehold estate is without merit.

If it is not believed that this opinion is a sufficient compliance with rule. 70½ of the Equity Rules (28 U.S.C.A. following section 723), findings of fact and conclusions of law may be submitted; otherwise, this opinion will stand as the findings of fact and conclusions of law in this case, and be deemed to constitute the formal decision thereof.

A decree of dismissal with costs may accordingly be entered.